We will now move to the next case, which is Tompkins v. Metro-North. All right, Mr. Witski. You may proceed. Thank you. May it please the Court. So the Federal Rail Safety Act is an anti-retaliation statute that was specifically enacted in 2008 to correct decades of intimidation. It's hugely fact-dependent, especially where an employer's intent is in play. And as this Court said in Quan v. Andalex 737 F. 3rd 834, there is a need for caution about granting summary judgment to an employer in a discrimination case where the merits turn on a dispute as to the employer's intent. In this case, the District Court specifically conflated some of the factual issues and weighed reasonableness on a number of the other facts. In fact, we have here a general foreman who at one point in an affidavit or a statement testifies that the ground conditions were safe, but then the employees who were there and talked to him before they were about to be sent out, he's told them they did a job safety briefing and he told them the conditions were terrible. And invariably, the witnesses said that the ground conditions were icy, hazardous, treacherous, and yet this employee, meaning Mr. Tompkins, was found to have been objectively unreasonable in his belief that it was an unsafe condition.  Let's say those facts are contested. But don't you have to then show that there's a factual dispute as to whether a reasonable individual would conclude that it's an imminent danger of death or serious injury? And that seems where Judge Etkin says there's not dispute. There might be disputes on some of the conditions. There might be facts in the record that suggest icy, but not so treacherous as to meet that level of the standard. So I believe number one to make that determination is a factual determination. What Judge Etkin's decision essentially did was say there is no reasonable jury on the face of this earth who could find that walking approximately a mile and a half to two miles at night in an active rail yard with icy conditions below 30 degrees presented a potential for imminent serious injury. Arguably, frankly, because of the nature of the active rail yard, meaning unprotected tracks, and the fact that there is no path to get that three-quarters of a mile up and three-quarters of a mile back, there is no path. There would have to cross tracks in order to do it. There actually is imminent potential for death, but, frankly, we don't have to go that far. We look at serious injury. Candidly, my caseload is replete with cases of serious injury premised specifically on slip and falls on ice. So I don't believe by any means that the role of the jury should be usurped by saying that it's impossible for a jury to find it reasonable. And we have, as witnesses as well, the other two witnesses. I mean, Mr. Steubing was a probationary employee who specifically said he was afraid to open his mouth because of reprisal. He went along with it. And what do we know that those two employees did right after they left? The first thing they did was Miller said, you are crazy, get in my car, and they drove up there. Why? Because it did present the very hazard that Sean Tompkins was raising. Why do you say that was the reason why? I mean, the record doesn't say that, right? The second record just says that they drove. Some people prefer to drive rather than walk. People from Connecticut do that all the time. People from Michigan do, too. Detroit. But the answer is, in fact, Mr. Tompkins himself had walked hundreds of times in the past when conditions were safe to do so. What Mr. Miller ended up saying was, first off, Lewis turned to them right after Tompkins was dismissed from the room and said, it's very terrible outside. That's at appendix 1049. He said, as soon as they got downstairs, and this is appendix 1050, as soon as we got downstairs, I told Harry he was crazy, get in my car, we'll drive. And he then picks up the foreman to bring him back. And what do all three of them do? Slip on ice. So if you want the objective proof of reasonableness, all three of them slipped. We have actual facts proving exactly what happened. The standard is not whether you might slip. The standard is whether there's imminent danger of serious injury. It seems to me what you're suggesting is that carmen can refuse to walk any time it's cold out, whether there might be ice. Is that what you're saying? No. If it was just a function of cold out, no issue whatsoever. What we had here was, and the record does contain this, is we had melted snow and ice throughout the conditions. We also know that they are supposed to provide transportation to and from and didn't. We know that the very vehicles that they were supposed to be able to use were broken down for several weeks. Now, the vehicles are available to avoid the very conditions Your Honor is talking about or asking about. But what we had here was a failure to provide those very vehicles. I mean, they either call them Cushmans or Gators or whatever. And what we ended up with is Mr. Tompkins having already been told he's not allowed to use his personal vehicle. Essentially what we got was Miller engaging in self-help in order to get around what he just saw happen to Sean Tompkins. That can't possibly be what we're encouraging. Let me ask. It seems like the key conclusion of the district court here is the following sentence. In fact, other than Tompkins, every individual cited in the record to have evaluated the situation on the night all agreed that walking to the wheelchair that night was not unsafe. Is your position that that's the wrong analysis or that factually the record doesn't support that conclusion? I'd argue both. And I would say that the easiest, candidly, is the second, which is the factual record just doesn't support it. So where does the record show that another individual to have evaluated the situation concluded, not that there was ice, not that it was cold, but that it was unsafe to the point of imminent risk of serious injury? No one stood there and said there is imminent risk of serious injury. We don't typically speak that way. What we do know is that the general foreman said it's very terrible outside to the employees that were left behind after Tompkins had been dismissed. We know that Miller in his deposition said that everything was frozen. It was well into the darkness. Walking in the dark, it was treacherous. Now, I don't know if what we're relying on is a witness must say, I don't want to walk outside because I feel there is imminent threat of serious harm. No, but this is after discovery, right? This is summary judgment. So it would have been very easy to put to the witnesses whether or not they felt the standard was met, imminent risk of serious physical harm. But that wasn't put to any of these witnesses, right? Not in that phrasing. No. However. It's terrible outside. It was treacherous. You're saying is synonymous with the standard, which is the relevant one, imminent danger of serious injury or death. I'm sorry. No, I interrupted you. I'm saying that a jury could certainly infer that that is synonymous. My definition doesn't really matter. It's whether or not a jury could find that that is the reasonable takeaway from that terminology. And from the fact that the foreman himself indeed fell or slept, I'm sorry, all three of them slept, that I don't think it's a bridge too far to say that slipping on ice can cause serious injury, particularly in the northeast, even in Connecticut. All right. You're reserved a minute. Yes, Your Honor. Mr. Wetzel. Thank you. Wetzel.  Wetzel. Just say Wetzel. It's easier. Okay. Counsel. Ms. Roth. Yes. The first person who ever got it right. Really? I'll butcher it in about a minute. That's what it means. All right. You may proceed. Thanks. Good morning, Your Honors. May it please the Court. Sean Hopkins did not want to walk to the wheelchair on January 18, 2014. He thought it would set a bad precedent. He just refused to go. The two other coworkers on his gang agreed to go. His supervisors assessed the situation, and they agreed it was reasonable to ask these men to go. One of them actually walked up to the wheelchair himself later that night. Sean Hopkins just refused to go. That was insubordination. It was not protected activity. Well, when you say bad precedent, that could be interpreted a number of ways, I suppose. It could be bad precedent because they're asking us to do things that pose a serious risk of imminent danger or serious injury. You're saying it was bad precedent for some other reason, I think, or that's what you're implying. There was another foreman who was present that night, and he was not a person who worked with this gang. He happened to be sitting in the room where this situation, where this discussion took place. In his written statement, he wrote, Carmen Tompkins told M. Miller that if we do this, in parentheses, walk to wheelchair, we would be doing it all the time. He didn't want to be told he had to walk to the wheelchair instead of being able to do his preference, which was to drive in his car or in the company car to get there. It would take him 20 minutes. It was cold outside. It was dark outside. He didn't want to go. And I think that the best evidence that I found in the record of whether it was objectively dangerous to go, and we have a lot of objective evidence of what everyone else thought that night, Michael Miller, who was one of the coworkers of Sean Tompkins, in his statement, his contemporaneous written statement, he wrote, We were to walk on that night. It was below freezing, somewhere in the mid to low 20s. All the snow from the day before melted during the day and was now a sheet of ice. Greg, meaning Greg Lewis, the foreman, the general foreman, I'm sorry. Greg, at this point, said to Sean, I know your answer. Then he looked at me and asked if I would go to wheelchair. After a moment of thinking about it, I said yes. Then Henry was asked, and he said yes. Mr. Miller, who is in the same position as Mr. Tompkins, with the same training, the same experience, acknowledges he knew what the conditions were that night. He was asked to go. He thought about it. He assessed the situation, and he determined it was reasonable for him to be asked to go. And yes, he then did go to his personal vehicle and drove because that was his preference. It's easier, it's faster, it's warmer to drive in your personal car the three-quarters of a mile. And he was not punished for doing that. Actually, the evidence is that the foreman that night, Palmietto, drove back with the men in their personal vehicle. They were never punished for that. Again, it was a personal preference. It's easier to drive. It's warmer. They prefer that. And so that was suggested in the record that Tompkins doesn't have that option available to him because the company cars don't work, and he's been told he may not use his personal vehicle. At least for summary judgment purposes, we should assume those things are true, right? Yeah, I agree. This was an unusual situation. Usually there were company vehicles available. Sean Tompkins had other options. He never asked whether he could take a personal vehicle that night given the unusual circumstances. He also could have walked on the supposedly icy path that nobody else had traversed and discovered to be icy at that point. He also could have walked. It's three-quarters of a mile, and there's an option where you can walk for a portion of it inside other buildings. So there were potentially three different options available to him. Instead of discussing these with his supervisors and finding a safe alternative, he just said he wouldn't go. That can't be the standard here. The railroad would shut down if every time it's cold out or potentially now if it's hot and humid and you think it's too hot to walk over there, you can just say, I'm not going to go. There was no way for him to do this work where he was in the building that he was in. He had to get there. Somebody had to get there to put this piece of equipment back onto the train so that the train could keep running. If employees are allowed to cloak their insubordination by using the word safety, a railroad will just shut down. There has to be a different standard that's in play. And the standard is that when an employee refuses to work, you look at whether their refusal to work was subjectively reasonable and also whether it was objectively reasonable. And I think that Judge Etkin looked at the objective evidence. And, Judge Nathan, you asked a question earlier about whether the phrase that Judge Etkin wrote in his opinion about what the other individuals that night looked at, was that the correct legal standard? And I think that is, because when you look at objective reasonableness, the question is what does a reasonable person with the same training and experience as the plaintiff believe to be objectively reasonable? It can't be. These are trained carmen. They've been Mr. Tompkins had worked for the railroad for many years. He'd worked. Kagan. I would suggest that unless more than one individual on site made the same assessment as the plaintiff here, the claim can't prevail. I mean, it seems to move from a sort of generalized objective standard, and here I think whether there are contested facts as to the level of dangerousness and the like, to that being resolved because the other individuals on the scene didn't come to the same conclusion or decided not to refuse the order despite a same the same conclusion. The plaintiff can't be the arbiter of what is ultimately objectively reasonable. There has to be some other person that gets to make this determination. Otherwise, a plaintiff, of course, will say it wasn't reasonable to ask me to go. It was too dangerous. And that would just take the meat out of the statute, which says, this is now in B to Big B, a refusal is protected under paragraph 1B and C if the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee and then B, a reasonable individual in the circumstances then confronting the employee would conclude that the hazardous condition presents an imminent danger of death or serious injury. The question is not what the plaintiff believed for this particular part of the standard. It's what a reasonable person in the same situation would have believed. And so Judge Etkin not ---- Sotomayor, and then the question is, is it enough to say everybody else on site made a different judgment? Is that – is there authority for that being the appropriate analytical move? I think it has to be, because Judge Etkin and no judge is a – is a carman or a railroad worker with that level of training and experience to know – I mean, the best evidence available to the judge was what everyone else did that night, and not just what they did, but then to look at what the arbitrators and the people involved in the disciplinary process also agreed was reasonable. Those are all trained people who have worked on railroads before. I think one could reasonably conclude that a person who works on a railroad might have – and works outdoors every day wearing safety boots and protective equipment might have a different opinion on what is a reasonable walk on icy conditions than somebody living in Manhattan walking on an icy sidewalk. Those aren't necessarily equivalent. And the question is not what does a juror believe is reasonable, but what does a person with the same training and experience as Mr. Tompkins believe is reasonable. And that's the best. The reason I put out a question is no reasonable jury could find for the plaintiff. And, you know, after summary judgment – I mean, in order to get summary judgment here, you've got to show that basically this was a – this case could not have come out the other way. Yes, Yes, Your Honor. And there is – there is conflicting evidence. There's conflicting facts on the margins. I don't think any of them are material to the question of— But you're discounting totally, I think, the plaintiff's statements. The plaintiff said that he didn't want to walk and it would set a bad precedent. He didn't say that it was unsafe. That goes to good faith or lack of good faith, I guess, right? That's right. It doesn't – it doesn't – the plaintiff actually – I don't think there's evidence in the record to show that the plaintiff said at the time that he wouldn't go because it was unsafe. His supervisors considered that as the reason why he might be saying he was not willing  And then they talked amongst themselves. reached that – stated that conclusion. That is not what the contemporaneous records show. The contemporaneous records don't use the word safety in them. They do acknowledge that it was icy that night. It was cold, but— Unsafe in terms of the standard that needs to be met here. It wasn't – there was no discussion about that with – the plaintiff made no statements on that regard. Right. He said he didn't want to go because there was no vehicle available to him. He wanted to go if there was a vehicle. If there was no vehicle, he didn't really have a solution as to how he would get there. Right. But there's – so there's no witness who was there who said, I thought it was seriously hazardous and a risk to my personal safety. No. Nobody said that. And there's no expert who says, well, if those were the conditions, that would be obviously a threat to individual safety. No. There was no expert discovery in this case. The closest we have to an expert are the people who worked on the railroad with their training and experience and what they thought was safe or unsafe at that time. I have nothing further unless the Court has more questions. No. All right. Thank you. Thank you, Your Honors. Mr. Witski. Is that right that in the contemporaneous record, and I'm agreeing that that's all that matters, but in the contemporaneous record, did Tompkins say, I'm not doing this, it's too dangerous? Stubing, the probationary employee, testified at his deposition at Appendix 1104 that Tompkins said he didn't want to walk because of bad conditions. Now, I'm not trying to play semantics, but to me, in the context of what was going on, talking about bad conditions, talking about snow, talking about ice, talking about it's cold, it's dark, that's synonymous with saying I don't want to go because it's not safe. And throughout the motion, in fact, in the 56.1 statement, for example, there were a number of items that said, dispute that the plaintiff used the word unsafe or the word safe, but all of these bad conditions, hazardous, treacherous, slippery, icy, I don't think that we have to suspend that level of common sense, and we shouldn't ask a jury not to make those type of inferences. And the very same witness, Mr. Miller, who my colleague was referring to, is talking about the sheet of ice, et cetera. Mr. Miller, in his deposition, said, once they get annoyed at you, your life turns to misery. I said I would do it just to avoid problems. But that's not the same as saying, and I agree then, that the hazardous condition presented an imminent danger of serious injury. No. He said that it was treacherous. He's the same person who said it was treacherous. And that's at Appendix 1. I mean, the bad precedent line that's attributed to your client, is that disputed that he said that, that this would be a bad precedent? No. No. Okay. And so does that go to the actual motivation for refusing? I mean, that's the suggestion of your friend on the appellee's side, which is that this statement reflects that the real goal here was to make sure that they're not asked to walk a quarter of a mile or half a mile, whatever it is, in the future. If that was true, then why would the railroad have conceded in their 56.1 statement at Appendix 1297 that Tompkins had walked it hundreds of times in the past without complaint? It doesn't set a bad precedent. If anything, him having walked it hundreds of times would set a bad precedent if that's what we're talking about. No. He had no issue with walking. He had an issue with the conditions. And I would ask the Court to take a look at it. And he had an issue with safety. I thought that was your problem. The conditions being unsafe. Bad weather. Raining. You know, whatever. He'd walked it in the rain. Yeah. Well, he doesn't want to, apparently, according to the statement, he didn't, they'll make you walk all the time was what he said. In ice and snow. He didn't say that. No. You're 100 percent right. But that's an evaluation for a jury. That's a determinant. That's great probing questions for cross-examination. And we can assess Mr. Tompkins' credibility. And then I can redirect on, had you ever walked in the rain before? And that's great. But what we're doing here at summary judgment is taking it away from the jury. And removing exactly what we said, which is that we're supposed to reserve, and frankly, both the, both OSHA and their final rule, which is 29 CFR 1982. And then in Rudolph v. Amtrak, which is ARB 11-07 said, a complainant may prevail by proving that the respondent's reason, while true, is only one of the reasons for its conduct, and that another factor is the complainant's protected activity. All right. Thank you. All right. Thank you, Mr. Witski. We'll reserve judgment. Well argued. Thanks very much.